JUL 14 2026 AM8:49
FILED - USDC - FLMD - TPA

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

KAI DENG,

    Plaintiff,

v.

    Case No. 8:26-cv-02008-JLB-TGW

BLADEN COMMUNITY COLLEGE,

    Defendant.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Dr. Kai Deng, proceeding pro se, brings this action against Defendant and alleges as follows:

**NATURE OF THE ACTION**

1. This is an employment-discrimination action arising under Title VII of the Civil Rights Act of 1964, as amended, including 42 U.S.C. § 2000e-2.

2. Plaintiff is an Asian American citizen and of Chinese national origin.

3. Plaintiff alleges that Defendant subjected him to discriminatory treatment and terminated his employment because of his race, national origin and his refusal to raise cheating students' grades from C to B.

4. Plaintiff further alleges that Defendant's stated reasons for terminating his employment were not the true reasons for its decision and were a pretext for unlawful discrimination, retaliation, breach of contract and FMLA interference.

5. Plaintiff also alleges that his employment was governed by written appointment documents and applicable employment policies that provided contractual or procedural protections. As a full-time faculty in a public

TPA 74582
$405

community college, Plaintiff Dr. Kai Deng was not an at will employee of the defendant.

6. Plaintiff seeks reinstatement or front pay, back pay, compensatory damages, punitive damages, declaratory and injunctive relief, costs, legal fees and all other relief authorized by law.

## PARTIES

7. Plaintiff Dr. Kai Deng is an adult resident of Sarasota County, Florida.

8. Plaintiff is Asian and of Chinese national origin.

9. Defendant is a public community college located in Dublin, North Carolina.

10. Defendant employed Plaintiff as a full-time mathematics instructor beginning August 12, 2025.

11. Defendant exercised authority over Plaintiff's assignments, supervision, discipline, compensation, working conditions, and termination.

12. Defendant is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

13. Defendant Bladen Community College is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

## JURISDICTION

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including Title VII of the Civil Rights Act of 1964.

15. This Court also has jurisdiction under 42 U.S.C. § 2000e-5(f)(3).

16. This Court also has jurisdiction under 28 U.S.C. § 1391(b).

17. Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) concerning the discrimination alleged in this Complaint.

18. The EEOC issued Plaintiff a Notice of Right to Sue dated June 30, 2026. See attachment A.

19. Plaintiff commenced this action within ninety days after receiving the Notice of Right to Sue.

20. Plaintiff has satisfied the administrative prerequisites applicable to the Title VII claims asserted in this Complaint.

21. The Court has supplemental jurisdiction under 28 U.S.C. § 1367.

**VENUE**

22. Plaintiff alleges that venue is proper in the Middle District of Florida under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

23. During the period immediately preceding the adverse employment actions, Defendant authorized Plaintiff in writing to perform employment duties remotely from Sarasota County, Florida.

24. From his authorized remote workplace in Sarasota County, Plaintiff completed end-of-semester duties, communicated with Defendant's administrators, submitted grades, and responded to the academic-integrity and grading dispute described below.

25. Defendant knew that Plaintiff was residing and performing authorized work in Sarasota County, FL.

26. Defendant directed communications concerning Plaintiff's employment, the investigation, and related employment actions to Plaintiff while he was located in Sarasota County.

27. Sarasota County is within the Tampa Division of the United States District Court for the Middle District of Florida.

28. Plaintiff acknowledges that Defendant is located in North Carolina.

29. Plaintiff dispute there is a venue issue in this honorable court.

## FACTUAL ALLEGATIONS

### Plaintiff's employment and qualifications

30. Defendant hired Plaintiff as a full-time mathematics instructor effective August 12, 2025.

31. Plaintiff remained employed until Defendant terminated him on January 29, 2026.

32. Plaintiff holds a doctoral degree in mathematics and was qualified to teach the mathematics courses assigned to him. Plaintiff was the only math PhD at the defendant.

33. Plaintiff taught courses that included two sections of MAT 271 (advanced Algebra) and online mathematics courses.

34. Plaintiff's employment was governed by written appointment documents, Defendant's personnel policies, and applicable policies governing North Carolina community colleges.

35. Plaintiff alleges that these documents and policies provided protections relating to the duration of his appointment, discipline, investigation, and termination. Plaintiff Dr. Kai Deng was a full-time faculty in a public community college, not an at will employee of the defendant.

**Concerns regarding examination integrity**

36. During October and November 2025, Plaintiff raised concerns with Lisa DeVane, Defendant's Vice President for Instruction, regarding the reliability and academic integrity of online or electronically assisted testing used in connection with mathematics courses.

37. Plaintiff was concerned that online testing was not accurate and students could use unauthorized assistance or electronic resources and that the resulting examination scores might not accurately reflect their mathematical knowledge.

38. DeVane responded by referring to faculty members' discretion and academic freedom regarding testing and instructional practices.

39. One of the students affected by the testing method was related to DeVane by bloodline whose scores were boosted by online testing.

40. In late November 2025, mathematics tutor Alex Horne, who was paid only $10 per hour by the defendant, informed Plaintiff that students had alleged that students in another course section were cheating.

41. In response to the concerns and allegations, Plaintiff divided the final examination into two portions.

42. Plaintiff administered the first portion on December 8, 2025. Students were permitted to use cellphones only for calculator functions.

43. Plaintiff administered the second portion on December 9, 2025. Cellphones and other electronic devices were prohibited.

44. Plaintiff informed students in advance, both in class and through Defendant's course-management system, of the format and conditions governing the final examination.

**Student Beta**

45. After grading the examinations, Plaintiff observed substantial differences between certain students' prior examination performance and their performance when electronic devices were prohibited.

46. A student identified in this Complaint as Student Beta had earned approximately 110 points out of 120 on four prior examinations administered under conditions permitting access to a cellphone, a "star" student. Plaintiff had praised this star student on his classes.

47. Student Beta earned approximately 3 points out of 60 on the December 9 examination portion administered without electronic devices.

48. Plaintiff observed that Student Beta appeared unable to perform any work, comparable to the work reflected in the student's earlier almost perfect examination scores.

49. Plaintiff had also observed Student Beta using a cellphone beneath the table constantly during the December 8 examination.

50. Plaintiff further observed an answer on Student Beta's December 8 examination that reached a correct numerical result through reasoning that was mathematically incorrect and inconsistent with that result.

51. Based on the examination results, Plaintiff's observations, and his review of the examination papers, Plaintiff concluded that there was substantial and undisputable evidence that Student Beta had used unauthorized assistance.

52. On December 9, 2025, Plaintiff reported his findings regarding Student Beta to Barry Priest, Defendant's Vice President for Student Services.

53. Plaintiff also informed Priest that he wished to withdraw a prior nomination of Student Beta for a college award.

54. Priest informed Plaintiff that Student Beta had not been selected for the award. Priest never doubted plaintiff's professional judgment.

## Student Gamma

55. Another student, identified as Student Gamma, had earned an average of approximately 95 on four earlier examinations but performed substantially worse on the December 9 examination when electronic devices were prohibited.

56. On December 10, 2025, Plaintiff informed his classes generally that he believed unauthorized assistance had occurred during prior examinations and emphasized that such assistance would not be permitted in the following semester's MAT 272 (Trigonometry) course.

57. Plaintiff did not identify any student by name when addressing the classes.

58. Student Gamma had previously enrolled in Plaintiff's Spring 2026 MAT 272 course as the first student and stayed as the only student in this advanced trigonometry class for several weeks.

59. By the early morning of December 11, 2025, around 8 AM before Plaintiff's class at 8:10 AM, Student Gamma had withdrawn from Plaintiff's section and enrolled in another instructor's section. It showed that student Gamma had withdrawn from his class the day earlier on December 10, 2025.

## Initial administrative responses

60. During the lunch break on Wednesday 12/10/2025, Plaintiff Dr. Kai Deng bumped into Ms. Christine Keogan (in the faculty lounge room), the Director of Arts and Education for the defendant with a Master Degree in English and without any formal math education beyond high school. Ms. Keogan vividly told the plaintiff in a very exciting tone that she heard that her students were talking about a "star" student of mine **bombed** the final exam when the phone and all electronic equipment were banned. Ms. Keogan had no doubt about this "star" Student Beta was cheating! Plaintiff Dr. Kai Deng asked her if plaintiff could ask the student to retake previous tests should they appeal the final grade. Ms. Keogan said of course the plaintiff had such right per the school policy. Plaintiff never told her this star student's name during this initial conversation.

61. Plaintiff also discussed the examination results with Lisa DeVane on or about December 10, 2025 early afternoon.

62. During the initial discussion, Plaintiff did not identify Student Beta by name.

63. Plaintiff explained that he was considering assigning Student Beta a final grade of C rather than an F despite Plaintiff's conclusion that unauthorized assistance had occurred.

64. Lisa DeVane initially indicated that Plaintiff's proposed resolution was acceptable, very fair and considerate.

65. Lisa DeVane also informed Plaintiff that he could require a student to retake earlier examinations if the student appealed the final grade.

66. On or about December 11, 2025, DeVane approved or expressed agreement with Plaintiff's proposed grade of C.

67. Because Plaintiff anticipated possible grade appeals, he retained copies of relevant examination papers.

68. Before Plaintiff left campus on December 12, 2025, neither his immediate supervisor, senior administrators, nor Human Resources had informed him that his employment was in jeopardy or that he was accused of violating a college policy. As a matter of fact, when Amanda Lee, the president of defendant saw Plaintiff in the faculty room making copies on 12/10/2025, she waived her hands and said in pleasant tone to see plaintiff next year! Plaintiff Dr. Kai Deng had impeccable records as of 12/12/2025.

### Authorized remote work and the grade dispute

69. DeVane authorized Plaintiff in writing to perform his remaining end-of-semester duties remotely from Sarasota County, Florida beginning December 15, 2025.

70. Plaintiff traveled to Sarasota, Florida, on December 12, 2025.

71. From his authorized remote workplace, Plaintiff completed and submitted final grades by Defendant's deadline.

72. After Plaintiff submitted the grades, Student Beta appealed the final grade.

73. Following the appeal, top school administrators, including the president Amanda Lee and Lisa DeVane, a Vice President for Instruction, directed and pressured Plaintiff to increase the grades assigned to Student Beta and Student Gamma from C to B.

74. Plaintiff objected because he believed the examination evidence supported his academic judgment concerning unauthorized assistance and student final Grades, he had assigned grades which had been approved by Lisa DeVane.

75. On December 18, 2025, while working from Sarasota County, Plaintiff sent a long email to DeVane and Defendant's president, Amanda Lee, explaining his academic-integrity concerns and responding to the instructions concerning the students' grades.

76. The December 18, 2025 email and related email chain are attached as Exhibit B, with student-identifying information appropriately redacted.

77. Plaintiff preserved copies of relevant communications because he was concerned that he might be disciplined for refusing to change the grades and for continuing to report suspected academic misconduct.

78. On December 18, 2025, Plaintiff contacted mathematics faculty members at the University of North Carolina at Chapel Hill to seek professional opinions concerning the examination evidence.

79. Plaintiff also communicated with a student related to DeVane during the evening of December 18, 2025 around 9 PM for less than one minute.

### Email-account events and investigation

80. At approximately 8:00 a.m. on December 19, 2025, Plaintiff logged into Defendant's email system before his family's trip to Canada to see if there is important email from school administrator.

81. Plaintiff received an electronic notice indicating that his college email account was scheduled for deactivation because of "planned retirement."

82. Plaintiff had not retired and had not informed Defendant's HR nor his direct supervisor that he intended to retire.

83. Plaintiff rejected or disputed the proposed deactivation and retained access to the account at that time.

84. After returning from a family trip in early January 2026, on or around 1/2/2026, Plaintiff discovered that the material and the crucial December 18 email was no longer present or available in the college email system.

85. Plaintiff alleges that records attached as Exhibit C reflect the removal or deletion of that email by the defendant. Plaintiff also sent email to Gina Floyd, a director for IT at defendant, told her that plaintiff knew she had deleted the crucial email on 12/18/2025 and warned her that she would be sued in the future and CC copied to all top school administrators, including, but not limited to, Amand Lee, the president, Lisa DeVane and Barry Priest, both Vice President, and Tiina Mundy, the HR Director with the proof of deletion in Exhibit C. None of them replied the email to deny their involvement of deletion of the email on 12/18/2025.

86. Plaintiff alleges that the timing of the proposed account deactivation and disappearance of the email supports an inference that Defendant was premeditating adverse employment action in the afternoon of 12/18/2025 after receiving Plaintiff's December 18 email.

87. On January 5, 2026, the first regular working day following the winter break, Defendant's Human Resources Director informed Plaintiff that he was the subject of a disciplinary investigation.

88. Defendant removed or suspended Plaintiff's teaching responsibilities while the investigation was pending.

### Assignment of Plaintiff's courses

89. On January 12, 2026, Plaintiff returned briefly to Defendant's campus to retrieve personal belongings.

90. On that date, Alex Horne informed Plaintiff that Lisa DeVane had contacted him about teaching Plaintiff's MAT 272 course, Steps away from the actual classroom.

91. Based on information available to Plaintiff, Mr. Alex Horne held a bachelor's degree and did not hold the graduate degree in mathematics ordinarily required to teach advanced courses like Trigonometry. Mr. Alex Horne lacks minimum credentials to teach at any community college in NC and was paid $10 per hour as a math tutor by defendant.

92. Alex Horne is White and 20 something.

93. Plaintiff alleges that Defendant was willing to assign Plaintiff's teaching responsibilities to a substantially unqualified White individual while investigating and ultimately terminating Plaintiff, an Asian American mathematics instructor holding a doctoral degree in Math.

94. The HR director Tiina Mundy had introduced plaintiff Dr. Kai Deng to the full board of the defendant back in fall 2025 with admiring tone as a hard-core science PhD in math (her exact words).

95. Plaintiff alleges that these circumstances support an inference that race, the color of his skin and/or national origin was a motivating factor in Defendant's treatment of him in addition to the facts that all school top administrators are white and two cheating students whom they were trying to protect are also white students

### Complaints to governing authorities

96. On January 12, 2026, Plaintiff sent a certified letter to the chair of Defendant's Board of Trustees challenging the investigation and requesting protection from retaliation.

97. On January 14, 2026, Plaintiff sent a similar certified letter to the chair of the State Board of North Carolina Community College Systems.

98. In those letters, Plaintiff described the academic-integrity dispute, the instructions concerning the students' grades, and his belief that the investigation was retaliatory and improper.

99. During January 2026, Plaintiff also contacted officials of the North Carolina Community College System concerning the dispute.

100. On or about January 15, 2026, Plaintiff provided Amanda Tolar, Director of Legal and Compliance for the North Carolina Community College System (NCCCS), with copies of the communications attached in Exhibits B and C.

101. Tolar replied Plaintiff email on the same day that she had forwarded the materials to top two executive and Chief Counsel within the System Office although previous emails to her went to silence. Both top two executives at NCCCS are white.

102. Tolar's communication is attached as Exhibit D.

### Plaintiff's mother's medical emergency

103. On or about January 17 or January 18, 2026, Plaintiff learned that his elderly mother had fainted, fallen, and been transported to a hospital emergency department in China.

104. Plaintiff informed Tiina Mundy, Defendant's Human Resources Director, of his mother's medical emergency and requested leave to travel to China under FMLA.

105. Plaintiff expressly referred to the Family and Medical Leave Act in making the request.

106. At the time of the request, Defendant had already removed or suspended Plaintiff's teaching responsibilities because of the investigation.

107. On January 20, 2026, Plaintiff sent Mundy copies of his boarding passes while traveling from the United States to China.

108. The boarding passes are attached as Exhibit E.

109. Plaintiff had previously worked at Forsyth Technical Community College, another institution operating within the North Carolina Community College System (NCCCS).

110. Plaintiff alleges that his prior and current public-college employment should be considered in determining whether he satisfied applicable leave requirements since both colleges are under the legal charter of NCCCS.

111. Plaintiff acknowledges that Defendant may dispute whether the two institutions constituted the same employer, joint employers, or otherwise permitted aggregation of Plaintiff's employment for FMLA purposes.

### Investigatory interview and termination

112. On or about January 22, 2026, Defendant sent Plaintiff notice of an investigatory interview email for 1/22/2026 roughly from 11:30 AM to 12:30 PM US Eastern time, which was **0:30-1:30 AM on 1/23/2026 China time**. The email notice is attached herein as Exhibit F.

113. Defendant knew at that time that Plaintiff was in China caring for his mother.

114. The proposed interview time was approximately **0:30-1:30 a.m. in China**.

115. Plaintiff had informed Defendant that common United States videoconferencing platforms were unavailable for him to use in China and that an alternative platform will be necessary.

116. Plaintiff did not see the interview notice until after the scheduled time, days later.

117. On January 29, 2026, while Plaintiff remained in China caring his mother, Defendant terminated his employment.

118. Defendant stated that Plaintiff had violated college policies.

119. Plaintiff denies committing the policy violations asserted by Defendant.

120. Plaintiff alleges that Defendant did not provide him with a meaningful opportunity to respond to the charges before terminating his employment.

121. Plaintiff alleges that Defendant had begun taking steps consistent with termination shortly after his December 18, 2025 email, including the proposed deactivation of his email account as early as afternoon on 12/18/2025. All subsequent so-called investigations were simply cover up and tried to hide the true reasons for wrongful termination by the defendant.

122. Plaintiff alleges that Defendant's investigation and stated policy reasons were inconsistent with the support administrators had previously expressed for his grading decisions.

123. Plaintiff further alleges that Defendant credited complaints made against him while disregarding his professional assessment of the examination evidence even though several school administrators agreed with plaintiff's professional judgment before 12/12/2025. These administrators included Lisa DeVane and Barry Priest, both are Vice Presidents by the defendant and Christine Koegan, a director by the defendant. Plaintiff's direct supervisor Lynn Marshburn even suggested to plaintiff in a later email that Dr. Kai Deng had the right to assign a F grade if he believes in the student was cheating.

124. Both Student Beta and Student Gamma are White.

125. The principal administrators involved in the challenged decisions are all White.

126. Defendant sought to transfer or assign Plaintiff's mathematics courses to Alex Horne, a White individual who lacked basic qualifications or credentials comparable to Plaintiff's PhD in math.

127. Plaintiff was qualified for his position and was performing his assigned duties before the academic-integrity and grade dispute arose without any incident.

128. Plaintiff alleges that Defendant's stated reasons for terminating him were false, incomplete, inconsistent, or exaggerated.

129. Plaintiff alleges that his race and Chinese national origin were motivating factors in Defendant's decisions to remove him from his courses and terminate his employment.

130. As a direct and proximate result of Defendant's actions, Plaintiff suffered loss of employment, wages, benefits, professional opportunities, and other damages.

### COUNT I Wrongful Termination for Title VII Race and National-Origin Discrimination

131. 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m) apply.

132. Plaintiff realleges and incorporates Paragraphs 1 through 130 of this Complaint to the extent relevant to this Count.

133. Plaintiff Dr. Kai Deng is an Asian American citizen and of Chinese national origin and is therefore a member of protected classes under Title VII.

134. Defendant and the administrators who participated in, recommended, approved, or implemented the challenged employment actions knew that Plaintiff was Asian American and of Chinese national origin.

135.    Plaintiff was highly qualified for his position as a full-time mathematics instructor. Plaintiff holds a doctoral degree in mathematics and was performing the teaching and other employment duties assigned to him before Defendant removed him from his courses and terminated his employment.

136.    Plaintiff suffered adverse employment actions when Defendant initiated a disciplinary investigation against him, removed or suspended his teaching responsibilities, arranged for another person to assume his assigned mathematics courses, and terminated his employment on January 29, 2026.

137.    Before the dispute concerning the students' grades, Plaintiff had not been informed that his employment was in jeopardy, had not received any material negative performance evaluation, and had not been notified that he was accused of violating a college policy.

138.    Defendant's administrators initially approved and/or expressed agreement with Plaintiff's proposed grading resolution and informed Plaintiff that he had authority to require a student to retake an examination if the student appealed the grade.

139.    After Plaintiff declined to increase the grades and continued to defend his academic judgment, Defendant abruptly changed its position, initiated an investigation, removed Plaintiff from his courses, and later terminated him.

140.    On December 19, 2025 early morning around 8AM, shortly after Plaintiff sent his December 18 email explaining the academic-integrity dispute, Defendant's information-technology system notified Plaintiff that his email account was scheduled for deactivation because of "planned retirement," even though Plaintiff had neither retired nor announced an intention to retire to HR or his direct supervisor.

141.    The proposed account deactivation occurred before Defendant formally notified Plaintiff of a disciplinary investigation and supports an

inference that Defendant had begun preparing to terminate Plaintiff's employment as early as afternoon on 12/18/2025 before even starting a fair investigation, let alone to conclude the investigation.

142.    While investigating and removing Plaintiff, Defendant sought to assign Plaintiff's MAT 272 mathematics course to Alex Horne, a White and part time math tutor who, upon information and belief, held only a bachelor's degree and lacked the graduate-level mathematics credentials ordinarily required to teach that course at the defendant.

143.    Plaintiff possessed substantially much greater academic qualifications for the assigned mathematics courses than Alex Horne, including a doctoral degree in mathematics.

144.    Defendant's willingness to transfer or assign Plaintiff's teaching responsibilities to a substantially unqualified, without basic credentials, White Math Tutor with only $10 per hour pay grade, together with the timing and irregularities surrounding Plaintiff's investigation and termination, supports an inference of discriminatory treatment.

145.    Defendant also denied Plaintiff a meaningful opportunity to respond to the accusations against him by scheduling an investigatory interview while Defendant knew that Plaintiff was in China caring for his mother, setting the interview at approximately **1:00 a.m. in China**, and failing to provide a reasonably accessible method for Plaintiff to participate.

146.    Defendant's asserted policy reasons for terminating Plaintiff were false, incomplete, inconsistent, exaggerated, or selectively applied and were a pretext for unlawful discrimination.

147.    Plaintiff's race and national origin were motivating factors in Defendant's decisions to remove Plaintiff from his assigned courses and terminate his employment.

148.    By intentionally treating Plaintiff adversely because of his race and national origin, Defendant violated Title VII, including 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m).

149.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages, lost employment benefits, loss of professional opportunities, emotional distress, inconvenience, humiliation, and other compensable injuries.

WHEREFORE, Plaintiff Dr. Kai Deng demands judgment against Defendant Bladen Community College for Wrongful Termination for Title VII Race and National-Origin Discrimination. Plaintiff is entitled to back pay, NC state Employee and Public Teachers Pension plan, prejudgment interest, reinstatement or front pay where reinstatement is not feasible, compensatory damages subject to applicable statutory limitations, declaratory and injunctive relief, costs, interest, legal fees and all other relief authorized by law.

## COUNT II BREACH OF WRITTEN NINE-MONTH FACULTY CONTRACT

150.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 to 149 concerning his employment, qualifications, performance, removal from teaching duties, investigation, and termination to the extent relevant to this Count.

151.    On August 6, 2025, Defendant, acting through its President, Amanda Lee, issued Plaintiff a written offer for the position of Math Instructor.

152.    The written offer letter is attached to this Complaint as Exhibit G.

153.    The offer letter expressly described the offered employment as a "full-time, 9-month faculty contract" with an annual salary of $71,000 and a start date of August 12, 2025.

154.    The offer letter further stated that decisions concerning the renewal of faculty contracts would be made annually.

155.    The offer letter therefore distinguished between Plaintiff's existing nine-month faculty contract and any later decision concerning renewal for another appointment period.

156.    Defendant's offer was contingent upon successful completion of background and reference checks.

157.    Plaintiff successfully completed or otherwise satisfied those contingencies, as demonstrated by Defendant's permitting Plaintiff to begin

employment, assigning him courses, paying him, and treating him as a full-time faculty member.

158.    Plaintiff accepted Defendant's offer by commencing employment on August 12, 2025 and performing the teaching, grading, advising, administrative, and other duties assigned to him.

159.    The written offer, Plaintiff's acceptance, and the parties' subsequent performance created a valid employment contract for a nine-month faculty appointment beginning August 12, 2025.

160.    Upon information and belief, President Amanda Lee was authorized to extend the offer and enter into the faculty employment contract on Defendant's behalf.

161.    Plaintiff performed the material obligations imposed upon him under the contract until Defendant prevented his further performance by removing him from his courses and terminating his employment.

162.    Before the academic-integrity and grading dispute described in this Complaint, Defendant had not informed Plaintiff that his teaching performance was deficient, that his employment was in jeopardy, or that he had committed conduct warranting termination of the existing nine-month contract. As of 12/12/2025, plaintiff Dr. Kai Deng was in great standing for his employment at the defendant.

163.    On January 5, 2026, Defendant removed or suspended Plaintiff from his assigned teaching responsibilities and informed him that he was the subject of an investigation.

164.    Defendant subsequently scheduled an investigatory interview while knowing that Plaintiff was in China caring for his mother, set the interview for approximately 1:00 a.m. in China, and failed to provide a reasonably accessible and timely opportunity for Plaintiff to respond.

165.    Defendant did not reschedule the interview or otherwise provide Plaintiff with a meaningful opportunity to present the examination records, emails, witness information, prior administrative approvals, and other evidence relevant to the accusations against him.

166. On January 29, 2026, Defendant terminated Plaintiff's employment before completion of the nine-month faculty-contract period.

167. Defendant stopped providing Plaintiff with the salary, benefits, employer retirement contributions, and other compensation due for the remaining portion of the nine-month contract.

168. Defendant asserted that Plaintiff had violated college policies.

169. Plaintiff denies committing conduct that provided a valid contractual basis for terminating the nine-month contract before its completion.

170. Defendant's asserted reasons were false, incomplete, inconsistent, exaggerated, selectively applied, fabricated to hide the true reasons for termination or otherwise not a good-faith justification for terminating Plaintiff's existing faculty contract.

171. Defendant's prior approval of Plaintiff's proposed grading resolution, its abrupt change of position after the grade dispute escalated, its attempted deactivation of Plaintiff's email account before formally announcing the investigation, and its failure to provide a meaningful opportunity to respond support the allegation that Defendant did not terminate the contract for a legitimate and good-faith reason.

172. Defendant breached the parties' written employment contract by terminating Plaintiff before completion of the nine-month appointment and refusing to provide the compensation due for the remainder of that contractual period.

173. Alternatively, to the extent Defendant possessed an implied contractual right to terminate the appointment before completion for legitimate cause, Defendant breached the contract by exercising that asserted right arbitrarily, pretextually, and without a good-faith contractual basis.

174. Defendant breached that implied covenant by preventing Plaintiff from completing the nine-month appointment and by refusing to pay the remaining contractual compensation based on reasons that Plaintiff alleges were predetermined, pretextual, and not asserted in good faith.

175.    Defendant entered the employment agreement through its president who was authorized to employ personnel on its behalf.

176.    Defendant entered the written faculty contract through an authorized representative. Plaintiff alleges that Defendant is legally responsible for the contractual obligations undertaken in that agreement.

177.    As a direct and foreseeable result of Defendant's breach, Plaintiff lost the unpaid portion of his contractual salary, employer retirement contributions, employment benefits, NC State pension and other compensation due during the remaining nine-month contract period.

178.    Plaintiff has mitigated and will continue to mitigate his damages as required by law.

179.    Furthermore, Plaintiff was promised a summer 2026 assignment with additional income, in addition to his regular annual pay of $71,000 per academic year, during regular staff meeting supervised by the department head Lynn Marshburn, the direct supervisor for plaintiff Dr. Kai Deng.

180.    In addition, the annual renewal of full-time faculty in a public community college is a formality. Plaintiff replaced previous retired math instructor Robert Herring, who held the same position for more than 30 years.

181.    Upon public information and belief, Mr. Robert Herring only has a master degree in math from Western Carolina University which does not have a PhD in math program. In comparison, plaintiff Dr. Kai Deng received his PhD. In math from a PhD program regarded as Group I by American Mathematic Society (AMS), a designation of first-class math education in the US while University of Florida's math PhD program is in Group II by AMS.

182.    It is therefore a reasonable inference that Plaintiff Dr. Kai Deng can choose to retire in 2034 when his younger son graduates from college.

**WHEREFORE**

Plaintiff Dr. Kai Deng respectfully requests that the Court enter judgment in his favor on Count II and award:

a. The unpaid salary and other compensation due for the remaining portion of Plaintiff's nine-month faculty contract plus his summer 2026 pay. Plaintiff's salary was spread for 12 months pay period;

b. The value of employer retirement contributions and employment benefits Plaintiff would have received during the remaining contractual period;

c. Prejudgment and post-judgment interest as permitted by law;

d. Taxable costs, legal fees and all cost related to this litigation;

e. The unpaid salary and other compensation due for the remaining portion of his planned retirement from 1/30/2026 until 12/31/2034;

f. Such other contract relief as the Court determines lawful and appropriate.

## COUNT III FMLA INTERFERENCE

183. 29 U.S.C. §§ 2612 and 2615(a)(1) apply.

184. Plaintiff realleges and incorporates the preceding allegations for paragraphs 1 to 182 to the extent relevant to this Count.

185. Defendant is a public employer covered by the Family and Medical Leave Act.

186. Before beginning employment with Defendant, Plaintiff was employed as a mathematics instructor by Forsyth Technical Community College.

187. On October 11, 2023, Forsyth Technical Community College issued Plaintiff a written offer for a temporary Math Instructor position. The offer stated that the start date would be determined later and provided for a nine-month salary of $61,200. The letter is attached as Exhibit H.

188. Plaintiff actually commenced employment with Forsyth Technical Community College on or about October 17, 2023 for 9-month appointment.

189. Plaintiff was employed by Forsyth Technical Community College under the name Peter Deng. Peter Deng and Kai Deng are the same person.

190. Plaintiff disclosed his prior Forsyth employment to Defendant during the application and onboarding process.

191. Forsyth Technical Community College and Defendant are public community colleges operating within the North Carolina Community College Systems.

192. Plaintiff alleges, upon information and belief, that the institutions constituted the same public agency for purposes of the FMLA's 12-month employment requirement based on their relationship within the statewide community college systems, common retirement-service recognition, statewide employment standards, and other facts to be established through discovery.

193. Plaintiff's North Carolina retirement records allegedly credited his combined service at the two institutions as at least 12 months of public service by November 30, 2025.

194. Plaintiff alleges that, if his qualifying service at both institutions is aggregated, he satisfied the FMLA's 12-month employment requirement before his requested leave commenced.

195. Counting Plaintiff's employment at Forsyth Technical Community College and Defendant, Plaintiff had been employed by the applicable FMLA employer for at least 12 months before his leave commenced.

196. During the 12 months immediately preceding the commencement of his requested leave, Plaintiff worked at least 1,250 hours for Defendant. Those hours included classroom instruction, preparation of lectures and instructional materials, creation and grading of examinations, grading

assignments, student communications, office hours, meetings, online-course administration, required training, academic reporting, 4 in person test creations and grading, two portions of last exam on December 8 and 9, and other assigned faculty duties.

197. Plaintiff regularly performed substantial work outside scheduled classroom hours, including during evenings, weekends, and from his homes in Sarasota, FL. Plaintiff's work is reflected in course schedules, examination materials, email records, learning-management-system activity, grading records, student communications, and other contemporaneous records. To the extent Defendant did not maintain accurate records of all hours worked by Plaintiff as a salaried faculty member, Defendant bears the burden of demonstrating that Plaintiff did not satisfy the 1,250-hour requirement.

198. Plaintiff worked at a worksite at which Defendant employed at least 50 employees within 75 miles.

199. On or about January 17 or January 18, 2026, Plaintiff learned that his elderly mother had fainted, fallen, and received emergency hospital treatment in China.

200. Plaintiff's mother suffered from a serious health condition.

201. Plaintiff was needed to provide physical care, psychological comfort, transportation, communication with medical providers, and other assistance to his mother since his elder brother was totally handicapped.

202. Plaintiff promptly notified Defendant of his mother's medical emergency and requested leave to travel to China to care for her.

203. Plaintiff expressly and explicitly invoked the FMLA in his communication with Defendant's Human Resources Director.

204. Defendant never denied that plaintiff was entitled to FMLA, never said that plaintiff was unqualified under FMLA and knew that Plaintiff had traveled to China for the stated family-care reason and received copies of Plaintiff's boarding passes on or around January 20, 2026.

205. Defendant did not provide Plaintiff with a timely and adequate notice determining whether he was eligible for FMLA leave.

206. Defendant did not ask Plaintiff to submit medical certification or other information supporting the leave request. Plaintiff Dr. Kai Deng actually sent his photo in ER in a hospital in his hometown with his mother in China on around 1/21/2026 or 1/22/2026 China time. Plaintiff sent photos to his wife via we chat and asked his wife to send those photos to Tiina Mundy, the HR Director.

207. Defendant did not provide Plaintiff with an eligibility notice informing him whether he was eligible for FMLA leave or identifying any eligibility requirement Defendant believed he had failed to satisfy.

208. Defendant did not provide Plaintiff with a notice of FMLA rights and responsibilities, request a medical certification, provide a certification form or deadline, or give Plaintiff a meaningful opportunity to submit medical or hospital documentation supporting the leave request.

209. On January 20, 2026, Defendant asked Plaintiff to provide his availability by 3:00 p.m. on January 21 and stated that, if Defendant did not receive a response, it would conduct the hearing on January 22 at 11:30 a.m. Eastern Time.

210. That proposed time corresponded to approximately 12:30 a.m. on January 23 in China. Plaintiff was traveling to China, did not timely see the notice, was unable to access his email and had informed Defendant that common United States videoconferencing services were inaccessible from China.

211. After Plaintiff did not appear since plaintiff did not know and did not have the means for proper video conference, Defendant did not provide another meaningful opportunity for him to respond before terminating his employment on January 29, 2026.

212. Defendant's failure to process Plaintiff's request, provide the required notices, and afford him an opportunity to supply certification interfered

with or restrained his attempted exercise of FMLA rights and caused him to lose wages, benefits, and the opportunity to obtain job-protected leave.

213. Defendant interfered with, restrained, or denied Plaintiff's exercise or attempted exercise of rights protected by the FMLA.

214. As a direct result of Defendant's interference, Plaintiff suffered lost wages, benefits, employment, and other actual monetary losses.

215. Had Defendant provided the required notices and opportunity to submit certification, Plaintiff would have supplied medical and other documentation supporting his leave request. Defendant's failures deprived Plaintiff of the opportunity to establish his eligibility, obtain protected leave, maintain applicable benefits, and return to employment following the leave period.

216. Plaintiff alleges that Defendant's violation was willful because Defendant knew that Plaintiff had expressly and explicitly invoked the FMLA and nevertheless failed to issue an eligibility determination or process his request before terminating his employment.

WHEREFORE, Plaintiff respectfully requests judgment in his favor on Count III and an award of:

a. Lost wages, salary, employment benefits, employer retirement contributions, and other compensation lost because of Defendant's FMLA violation;

b. Actual monetary losses directly resulting from the violation, to the extent permitted by law;

c. Interest at the prevailing rate;

d. Liquidated damages as provided by 29 U.S.C. § 2617(a)(1)(A)(iii);

e. Reinstatement or other appropriate equitable relief;

f. Taxable costs and any attorney's fees recoverable under 29 U.S.C. § 2617 if Plaintiff later retains counsel; and

g. Such other relief as the Court determines lawful and appropriate.

On July 14, 2026

Dr. Kai Deng, Pro Se
5320 Hunt Club Way
941-882-2198 Mobile
Primary Email:
bj_banker@hotmail.com